## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
ex rel. KEVIN THOMAS, and
CAROLYN THOMAS,

       Plaintiff,

v.

                          Case No. 11-2475-DDC-JPO

BLACK & VEATCH SPECIAL
PROJECTS CORP.,

       Defendant.

_____

### MEMORANDUM AND ORDER

Relator plaintiffs Kevin Thomas and Carolyn Thomas bring this qui tam action alleging

violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, on behalf of the United

States against defendant Black & Veatch Special Projects Corporation.  Relators assert that

defendant knowingly submitted legally false requests for payment to the government and the

government paid those requests.  This matter comes before the Court on defendant's Motion for

Summary Judgment (Doc. 121), relators' Motion for Leave to File Surreply Memorandum in

Opposition to Defendant's Motion for Summary Judgment (Doc. 132), and relators' Motion to

Reopen Discovery for the Limited Purpose of Taking Deposition of William Van Dyke (Doc.

134).  For the reasons explained below, the Court grants defendant's motion (Doc. 121) and

denies both of relators' motions (Docs. 132, 134).

### I.      Procedural Background

Relators filed their Complaint on August 23, 2011 (Doc. 1).  Their claims arise from

defendant's contract with the United States Agency for International Development ("USAID") in

support of the Kandahar Helmand Power Project ("KHPP") in Kandahar, Afghanistan.  Relators

allege that defendant knowingly sought false payment from the United States for wages and expenses of seven employees for whom defendant fraudulently obtained work visas and permits from the Afghan government.  Because defendant's contract with USAID requires defendant to comply with Afghan law, relators contend that defendant has presented false claims.

Consistent with 31 U.S.C. § 3730(b)(2), relators served a copy of the Complaint on and disclosed their material evidence and information to the Attorney General of the United States and the United States Attorney for the District of Kansas.  The government declined to intervene under the authority conferred by 31 U.S.C. § 3730(b)(4)(B) (Doc. 8).

Relators amended their Complaint on March 15, 2013 (Doc. 18).  The Court subsequently granted them leave to file a Second Amended Complaint on May 20, 2013 (Doc. 48).  It alleges that defendant violated the FCA under both the express false certification theory and the implied false certification theory.  Defendant moved to dismiss the Second Amended Complaint under Rule 12(b)(6) (Doc. 49).  The Court dismissed relators' express false certification claim but declined to dismiss their implied false certification claim (Doc. 56).

## II.    Uncontroverted Facts

The following facts are uncontroverted or, if controverted, are stated in the light most favorable to relators as the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### A.  KHPP Contract

Defendant and USAID entered into Contract No. 306-C-00-11-00506-00 on December 9, 2010.  The contract's purpose is "to support the Kandahar Power Initiative (KPI), a critical component of the U.S. government's Counterinsurgency (COIN) strategy in Southern Afghanistan."[1]  Doc. 122-2 at 4.  The contract is part of a larger USAID program designed to

---

[1] USAID changed the name of the Kandahar Power Initiative ("KPI") to the Kandahar Helmand Power Project after the contract was signed.

increase development of Afghanistan's South-East Power System and connect it with other electrical grids in Afghanistan.  Its primary objective aims to increase the supply, quantity, and distribution of electrical power, with particular emphasis on the city of Kandahar.  Doc. 122-2 at 8.

The contract designates defendant as the "Contractor" for this project.  Section B.2 provides, "[f]or the consideration set forth below, the Contractor shall provide the performance requirements described in Section C and the deliverables or outputs described in Section F." Doc. 122-2 at 4.  In turn, Section F.4.A lists six deliverable components, along with thirteen sub-components.  All involve constructing, installing, repairing, refurbishing, and renovating electric generation and distribution equipment in and around Kandahar.  Doc. 122-2 at 35-39.  Section C.4 sets out 14 performance requirements that defendant must satisfy.  Those requirements are: (1) Environmental Assessment; (2) Procurement and Subcontracting; (3) Commodities/Equipment Procurement and Installation; (4) Management and Supervisory Responsibilities; (5) Coordination and Implementation of Work; (6) Quality Control/Quality Assurance; (7) Safety; (8) Contract Performance Support; (9) Cost Control Reporting System; (10) Pre-Construction Conferences; (11) Schedule; (12) Project Completion and Turnover Activities; (13) De-mining; and (14) Measuring and Monitoring.  Doc. 122-2 at 20-25.

The contract incorporates by reference 128 federal and USAID acquisition regulations.  Doc. 122-2 at 62-65.  Among other contractual obligations, these regulations require defendant and its employees to:  (1) comply with all applicable United States and host country laws (48 C.F.R. § 52.225-19(d)); (2) secure all "passports, visas, entry permits, and other documents required . . . to enter and exit the foreign country" (48 C.F.R. § 52.225-19(e)(2)(iii)); and (3) as

directed by USAID's Contracting Officer, remove and replace personnel who violate the terms of the contract (48 C.F.R. § 52.225-19(h)).

Defendant also must disclose to USAID's Office of the Inspector General ("OIG") and USAID's Contracting Officer, in writing and in a timely fashion, any evidence that defendant, its employees, or subcontractors have committed "(A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (B) A violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)" in connection with the award, performance, or closeout of the contract.  Doc. 122-2 at 66-67.

The contract also requires defendant to "provide all engineering, procurement, construction, and other material, equipment and/or services necessary to complete and successfully commission each of the six components in accordance with the requirements of this Contract."  Doc. 122-2 at 9.  USAID has the right to take possession of and use all or any portion of the work performed by defendant upon "substantial completion."  Doc. 122-2 at 32-33.  The contract defines "substantial completion" to mean the "stage in the progress of the work as determined and certified by the Contracting Officer in writing to the Contractor, on which the work (or a portion designated by the government) is sufficiently complete and satisfactory."  Doc. 122-2 at 32.  Taking possession or using the work upon substantial completion does not constitute acceptance.  Doc. 122-2 at 33.  And all work remains subject to USAID's final inspection and acceptance.

Defendant submits invoices for payment to USAID's Office of Financial Management every two weeks.  When defendant submits invoices, it simultaneously submits a copy of each invoice and a voucher listing all products and services provided during each two-week period to USAID's Contracting Officer's Technical Representative ("COTR").  The COTR reviews and

approves the vouchers and authorizes payment of a "proper invoice" within 14 days of receiving them.  Under 48 C.F.R. § 52.232-16(c), USAID's Contracting Officer may reduce or suspend payment if it finds substantial evidence that defendant failed to comply with any material requirement of the contract.

When defendant completes all work on a deliverable component or subcomponent (excluding any continuing obligations), the contract requires USAID's Contracting Officer to issue a notice of final acceptance.  Final payment occurs after all required tests are completed satisfactorily, a final inspection confirms that all known defects were corrected and all work is complete, and defendant submits all completion documentation.  Section G.5(c) provides that the government must make any payments due under a voucher "[u]pon compliance by the Contractor with all provisions of this contract, acceptance by the Government of the work and final report, and a satisfactory accounting by the Contractor of all Government-owned property for which the Contractor had custodial responsibility."  Doc. 122-2 at 47.

By December 23, 2014, USAID had issued notices of final completion and acceptance on 10 of the contract's 13 deliverable subcomponents.  Notices of final completion and acceptance are currently pending on the three remaining subcomponents.  In December of 2013, USAID and defendant modified the original contract to include additional work awarded to defendant.  The additional work is expected to continue through November of 2015.

### B.  Requirements To Obtain Afghan Work Permits and USAID Employee Approval

Before working in Afghanistan, all of defendant's non-Afghan employees must obtain work visas and work permits from the Afghan government.  The Afghanistan Ministry of Labor, Social Affairs, Martyrs & Disabled and its Ministry of Foreign Affairs (the "Ministries") issue visas and permits to foreign citizens working in Afghanistan.  As part of the visa and permit

application process, foreign citizens must submit copies of educational diplomas, degrees, certificates, or other credential documents to the issuing Ministries.  According to the parties, if an application packet does not include a diploma or degree, clerks at the Ministries sometimes will attempt to solicit bribes before they will process the application.  According to defendant, it is defendant's policy not to pay bribes.

The contract requires defendant to obtain USAID approval of all employees who will work on the project outside the United States.  Before an employee arrives in Afghanistan, defendant must submit a "Form 1420—Contractor Employee Biographical Data Sheet" to USAID.  This form contains a section where defendant lists each employee's diplomas, degrees, work experience, or other qualifications.  The Form 1420s submitted by defendant do not reference the forged educational documents discovered by relators.

### C.  Relators' Discovery of Forged Educational Documents

Relators Kevin Thomas and Carolyn Thomas worked for defendant in Afghanistan from April 18, 2011, until they resigned on July 16, 2011.  On June 25, 2011, Mr. Thomas discovered forged educational documents for seven employees working in Afghanistan.  Mr. Thomas is one of the seven.  Mr. Thomas found the forged documents on a shared network drive accessed via a USAID-owned desktop computer.  The computer is identified as "LighteningBug 1A," and it was located in defendant's human resources office in Kabul.  Nearly all of defendant's employees in Afghanistan could access this computer.  Immediately after finding these forged documents, Mr. Thomas reported his discovery to defendant's acting "Chief of Party," Lynn Liikala-Seymore.  When Ms. Liikala-Seymore received Mr. Thomas's report, she secured LighteningBug 1A and removed it from service.

Two days later, on June 27, 2011, Mr. Thomas contacted the USAID OIG.  He provided the OIG with copies of the forged documents, a spreadsheet containing contact information for each employee named in the forgeries, and a list of all employees who were present on the project site when the documents were discovered.

Two more days later, on June 29, 2011, Ms. Thomas met with representatives from the OIG at the USAID compound in Kabul.  She presented the OIG with additional copies of the forged documents and described their discovery.  Later, Ms. Thomas described the OIG's reaction to this discovery, saying that they did not appear interested in them.  She also said that the OIG told her the documents were an issue between defendant and the Afghan Government, and that USAID was interested in them only if defendant "was using these forgeries to get more money out of USAID."  Doc. 122 at 12.

Ms. Liikala-Seymore also met with the USAID OIG on June 29, 2011, to discuss the forged documents.  She also provided the OIG with information about defendant's human resources personnel involved in acquiring Afghan visas and work permits.  At OIG's request, Ms. Liikala-Seymore forwarded a copy of a memorandum describing an exit interview of former employee, Khalid Afridi.  Mr. Afridi, an Afghan national, was a visa expediter who had performed his work primarily on LighteningBug 1A.  During his exit interview, Mr. Afridi asserted that another one of defendant's employees, Dr. Manizha Hadi, may have tried to frame him as the person who forged the documents.  Defendant provided the USAID OIG with Mr. Afridi's email address so that they could question him about the forged documents.

In July of 2011, Ms. Liikala-Seymore met with USAID COTR, Tom Bauhan.  After that meeting, Mr. Braun understood that defendant's personnel in Afghanistan had created forged educational documents for employees and had submitted those documents to the Afghan

government to obtain work permits.  Defendant also informed USAID's Contracting Officer, Alvera Reichert, that defendant's personnel may have created and submitted forged educational documents to the Afghan government.  Despite this knowledge, USAID did not reduce or suspend payment of defendant's invoices.  Also, USAID did not ask defendant to remove any of its employees from the project.

Defendant and USAID each conducted independent investigations into the forged documents.  Defendant made three attempts to obtain copies of the documents filed at the Afghan Ministries on behalf of its seven employees.  The Ministries did not provide copies of the filed documents to defendant.  USAID's attempts to retrieve copies of the documents from the Ministries also failed.

Defendant's investigation included a third-party forensic analysis of all relevant computers to determine who had created the forged documents.  In November of 2011, defendant informed the USAID OIG that its analysis had concluded that someone had stored and modified the documents on LighteningBug 1A, the computer primarily used by Khalid Afridi.  Defendant also informed the USAID OIG that its analysts had searched the computers issued to relators, and there was no evidence that someone had created or modified the forged documents on their computers.  Defendant surrendered the seven computers examined and also provided the USAID OIG with a copy of its forensic report.

### D.  2013 Submission of Forged Documents

After relators had discovered the forged documents, defendant attempted to remove all electronic and paper copies of the documents from its files.  Despite its efforts, in May of 2013, defendant learned that it had inadvertently filed two forged documents with the Afghan

Ministries.  Defendant had filed the forged documents on May 19, 2012, and September 15, 2012, with work permit renewal applications for two employees.

Defendant promptly notified USAID's Contracting Officer and Senior Legal Advisor.  It provided USAID with the dates when it had obtained the two work permits and the amount of time its employees worked under those permits.  Even though it knew that the employees had worked in Afghanistan under work permits obtained with forged documents, USAID did not reduce or refuse payment of defendant's invoices.  And USAID did not take any other adverse action against defendant.

### III.    Relators' Motion for Leave to File Surreply

Before addressing defendant's Motion for Summary Judgment, the Court, first, must determine whether it should consider relators' proposed Surreply (Doc. 132-1).  Defendant filed its Motion for Summary Judgment (Doc. 121) and Memorandum in Support (Doc. 122) on December 23, 2014.  Relators filed their Memorandum in Opposition (Doc. 128) on January 26, 2014, and defendant filed a Reply (Doc. 131) on February 13, 2015.  Following this initial round of briefing, relators filed a Motion for Leave to File Surreply Memorandum (Doc. 132).  Defendant opposed relators' request to file a Surreply (Doc. 133), and relators filed a Reply on that issue (Doc. 136).

D. Kan. Rule 7.1(c) limits briefing on motions to the initial motion (including a memorandum in support), a responsive brief or memorandum, and a reply brief or memorandum.  "Surreplies typically are not allowed."  *COPE v. Kan. State Bd. of Educ.*, No. 13-4119-DDC-JPO, 2014 WL 6819462, at *2 (D. Kan. Dec. 2, 2014) (citing *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 Fed. Appx. 752 (10th Cir. 2006)).  "[S]urreplies are permitted only with leave of court and under 'rare circumstances.'"  *Id.*

(quoting *Humphries v. Williams Natural Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1

(D. Kan. Sept. 23, 1998)).  Circumstances may warrant a surreply if a moving party presents new

material, including new evidence or new legal arguments, in its reply.  *Id.* (citing *Green v. New

Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d

1117, 1139 n.13 (10th Cir. 2003)).  A court may not rely on new material first presented in a

reply without granting the non-movant leave to file a surreply.  *See Conroy v. Vilsack*, 707 F.3d

1163, 1179 n.6 (10th Cir. 2013) ("[A] district court abuses its discretion only when it both denies

a party leave to file a surreply *and* relies on new materials or new arguments in the opposing

party's reply brief.").  "The rules governing the filing of surreplies 'are not only fair and

reasonable, but they assist the court in defining when briefed matters are finally submitted and in

minimizing the battles over which side should have the last word.'"  *COPE*, 2014 WL 6819462,

at *2 (quoting *Humphries*, 1998 WL 98293, at *1 (citation and internal quotation marks

omitted)).

Realtors request leave to file a Surreply to address:  (1) defendant's submission of

evidence about its communications with USAID to obtain witness declarations of former USAID

employees; (2) defendant's argument that relators only may prevail with USAID testimony that

payment would have been refused or reduced had USAID known of the forged documents; (3)

defendant's reliance on *United States ex rel. Smith v. Boeing Co.*, 05-1073-MLB, 2014 WL

5025782 (D. Kan. Oct. 8, 2014), for the first time in its reply; and (4) defendant's reliance on

*United States ex rel. Davis v. District of Columbia*, 679 F.3d 832 (D.C. Cir. 2012) for the first

time in its reply.

Defendant opposes relators' motion for leave to file a Surreply.  It argues that the

evidence of its communications with USAID and argument about the absence of USAID

testimony supporting realtors' position are not new, and that it offered both in response to

relators' Memorandum in Opposition.  Defendant also argues that *Smith* and *Davis* do not

support new legal theories, and both cases are relevant to arguments contained in relators'

Memorandum in Opposition.

The Court finds that relators' proposed Surreply does not address any "new material"

advanced by defendant in its Reply.  Instead, the proposed surreply advances new legal argument

and expands arguments that relators made or could have made in their Memorandum in

Opposition.  "This is precisely why our Court typically does not allow surreplies."  *COPE*, 2014

WL 6819462, at *3 (citing *Hall v. Whitacre*, No. 06-1240-JTM, 2007 WL 1585960, at *1 (D.

Kan. May 31, 2007) (finding "utterly no justification for [a] surreply" that "essentially provides

additional and longer arguments, which also could have been submitted in the first response");

*E.E.O.C. v. Int'l Paper Co.*, No. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992)

(striking a surreply because "[t]he paper exchanges between parties must have an end point" and

courts should not permit them to "become self perpetuating").

Defendant's communications with USAID do not constitute "new material" that could

justify the proposed Surreply.  Defendant's Reply (Doc. 131 at 5-7, 28) included the USAID

communications in response to relators' arguments.  Specifically, defendant offered the

communications to rebut an objection that it failed to comply with USAID's "*Touhy*" regulations

when it acquired declarations from two USAID employees.[2]  This evidence, submitted in

response to an existing objection, is not "new material."  *See COPE*, 2014 WL 6819462, at *3

(finding that "a response to an existing argument made by plaintiffs" is not new material).  In

---

[2] USAID's "*Touhy*" regulations are codified at 22 C.F.R. §§ 2061, *et seq.*, and they outline the procedure USAID
employees follow to disclose agency materials or testify in response to a subpoena, order, or demand in legal
proceedings when USAID is not a party.  *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468-69 (1951)
(affirming regulation prohibiting federal employees from disclosing agency documents or testifying without consent
of the agency head).

addition, relators possessed defendant's USAID communications for 34 days before they filed their Memorandum in Opposition.  Thus, their memorandum could have included the arguments they now seek to advance in the proposed Surreply.  A court should not grant leave to file a surreply if the requesting party could have included its argument in an earlier response.  *See Hall*, 2007 WL 1585960, at *1.

Defendant also contends that relators misportray its argument about relators' lack of USAID testimony.  The Court agrees.  Contrary to relators' Motion for Leave to File Surreply (Doc. 132), defendant's Reply does not contain a new argument that testimony from a USAID official is "strictly necessary" for relators to prevail.  Instead, defendant offers its argument about relators' lack of USAID testimony in response to existing arguments made by both parties.  Indeed, relators' Reply in support of its motion for leave to file surreply concedes that if defendant "does not contend testimony of a USAID official is strictly necessary for Relators to prevail in this case, then Relators agree [that] they do not need to address that contention in a surreply."  Doc. 136 at 2.

Finally, the two cases that defendant cited for the first time in its Reply are not "new material."  It is evident that defendant has cited *Smith* in response to relators' arguments that compliance with Afghan law is a prerequisite to payment under the contract and was material to USAID's payment decision.  Doc. 131 at 27-30.  It is also evident that defendant cites *Davis* to meet relators' theory of damages—a theory advanced in their Memorandum in Opposition.  Doc. 131 at 46-49.  Relators request leave to explain why *Smith* and *Davis* are not relevant to this case.  Doc. 136 at 2.  But permitting "a surreply in response to an argument that is not 'new' contradicts our rules governing briefing on motions."  *COPE*, 2014 WL 6819462, at *4 (citing

D. Kan. Rule 7.1(c) (limiting briefing on motions to the motion, a supporting memorandum, a response, and a reply)).

The Court thus denies relators' Motion for Leave to File Surreply Memorandum (Doc. 132).  While it will not consider the proposed Surreply in its analysis, the Court has reviewed the arguments advanced by the proposed Surreply and has concluded that they would not alter the outcome of defendant's Motion for Summary Judgment.  The Court would reach the same conclusion, with or without the Surreply's arguments.

## IV.    Relators' Motion to Reopen Discovery

Next, the Court turns to relators' Motion to Reopen Discovery for Limited Purpose of Taking Deposition of William Van Dyke (Doc. 134).  Relators request an order permitting them to depose Mr. Van Dyke, defendant's president, about a December 1, 2014 memorandum he sent to USAID.  The memorandum contains this statement:  "BVSPC and USAID OIG investigated this event extensively at the time of the allegations."  Doc. 134 at 10.  Because the memorandum was created and produced after discovery had closed, relators argue that they have not had a chance to question Mr. Van Dyke's knowledge of the investigation and the basis for his statement.  Defendant opposes relators' motion.

In their Reply Memorandum supporting their motion to reopen discovery (Doc. 139), relators explain that they do not seek to depose Mr. Van Dyke to add to the summary judgment record.  They do not contend "that they did not (or were unable to) present facts sufficient to defeat [defendant's] summary judgment motion . . . ."  Doc. 139 at 2.  Instead, relators seek Mr. Van Dyke's deposition only to use it trial.  Doc. 139 at 2.

Given this clarification, the Court concludes that it need not rule on the motion to reopen discovery before determining the merits of defendant's Motion for Summary Judgment (Doc. 121). Accordingly, relators' Motion to Reopen Discovery (Doc. 134) is denied as moot.

## V.     Summary Judgment Standard

Turning to the summary judgment motion itself, the Court, first, repeats the well-established standard governing this motion: Summary is appropriate if the moving party demonstrates that there is "no genuine dispute [about] any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)). A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

14

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'"  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Summary judgment is not a "disfavored procedural shortcut."  *Celotex*, 477 U.S. at 327. To the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

**VI.    Analysis**

Defendant moves for summary judgment on relators' FCA claims for two reasons.  First, defendant argues that relators cannot show that its invoices submitted to USAID were legally false under an implied certification theory.  Second, defendant asserts, even if relators could prove the invoices were legally false, they cannot establish that USAID suffered any damages. The Court addresses each of these arguments, in turn, in the next two subsections.

**A.  False or Fraudulent Claims Under the FCA**

The FCA "'covers all fraudulent attempts to cause the government to pay out sums of money.'"  *United States ex rel. Conner v. Salina Reg. Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (quoting *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1172 (10th Cir. 2007)).  The FCA's qui tam provisions permit a private plaintiff to bring civil actions on behalf of the government.  31 U.S.C. § 3730(b).  And while the government "may

intervene and take over a private plaintiff's case, [31 U.S.C. §§ 3730(b)(2) and (c)(3)], it often declines to do so." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010).  If the government declines to intervene, a private plaintiff may proceed as a relator on behalf of the government.  31 U.S.C. § 3730(d)(2).  A relator is entitled to a portion of any civil penalty and damages awarded.  *Id*.

The substantive provisions of the FCA impose civil liability against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B).  A person who violates the FCA is subject to treble damages and a civil penalty between $5,000 and $10,000.  § 3729(a)(1).

To violate § 3729(a)(1), one must act knowingly.  But there is no requirement that a payee act with a specific intent to defraud the government.  § 3729(b)(1)(B).  Instead, a payee must have acted with actual knowledge of the false information, or with a reckless disregard for or deliberate ignorance of the truth or falsity of the information.  § 3729(b)(1).

FCA liability under § 3729(a) may result either from a factually false or legally false claim for government payment.  *Lemmon*, 614 F.3d at 1168.  A factually false claim arises when a claimant submits "'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'"  *Id*. (quoting *Conner*, 543 F.3d at 1217).  In contrast, a legally false claim generally requires a relator to show that a payee falsely certified compliance with a statute, regulation, or contract provision "*as a condition* to government payment."  *Conner*, 543 F.3d at 1217 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)) (emphasis in original).

16

The Tenth Circuit recognizes two kinds of legally false claims—one based on an express false certification and another based on an impliedly false certification. *Lemmon*, 614 F.3d at 1168; *Conner*, 543 F.3d at 1217; *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000).  An express false certification occurs when a payee "'falsely certifies compliance with a particular statute, regulation, or contract term, where compliance is a prerequisite to payment.'"  *Lemmon*, 614 F.3d at 1168 (quoting *Conner*, 543 F.3d at 1217).  The certification need not involve a literal certification, and, instead, can arise from any false statement "that relates to" the payee's claim.  *Id.*; *see also United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.").  A FCA plaintiff can bring an express false certification claim under § 3729(a)(1)(A) or § 3729(a)(1)(B).

An implied false certification "requires 'only the presentation of a false or fraudulent claim for payment or approval' without the additional [§ 3729(a)(1)(B)] requirement of a 'false record or statement.'"  *Lemmon*, 614 F.3d at 1168 (quoting *Shaw*, 213 F.3d at 531-32).  As a result, implied false certification claims focus "on the underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the government's payment."  *Id*. at 1168-69 (quoting *Conner*, 543 F.3d at 1218).  "If a contractor knowingly violates such a condition while attempting to collect remuneration from the government, he may have submitted an impliedly false claim."  *Id.*

Besides proving that a payee falsely certified compliance as a prerequisite to payment, a relator asserting either an express false certification claim or an implied false certification claim must demonstrate that the false certification was material.  *Id*. at 1169.  A false certification is

17

material if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property."  § 3729(b)(4).  "Thus, a false certification . . . is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made."  *Lemmon*, 614 F.3d at 1169 (citing *Conner*, 534 F.3d at 1219).

Relators here premise their claim on an implied false certification theory.  Thus, to survive summary judgment, relators must adduce specific facts from which a rational jury could find that:  (1) defendant knowingly submitted legally false claims for payment to the government; (2) the government paid the claims; and (3) had the government known of the falsity, it may not have paid the claims.  *See Lemmon*, 614 F.3d at 1169.  No dispute exists about the fact of payment.  Everyone agrees that the government paid defendant's invoices.  The parties disagree, though, about the other two elements of relators' implied false certification theory.

Relators contend that defendant submitted legally false claims to USAID by impliedly certifying its compliance with Afghan law.  In its memorandum, defendant argues that relators' FCA claims fail because compliance with Afghan law is not a prerequisite to payment under the contract.  Defendant also notes that no dispute exists whether it disclosed the facts and circumstances surrounding the forged documents to USAID immediately after relators discovered them.  Because USAID has continued to pay its invoices, defendant argues that compliance with Afghan law is not a condition to government payment.

Relators' claim essentially relies on a two-part argument.  First, they argue that the contract expressly requires compliance with all provisions before payment.  In support of this argument, relators cite Section G.5(c) of the contract, which provides in relevant part:

> *Upon compliance by the Contractor with the all provisions of this contract*, acceptance by the Government of the work and final report, and a satisfactory

accounting by the Contractor of all Government-owned property for which the Contractor had custodial responsibility, *the Government shall promptly pay the Contractor any moneys (dollars or local currency) due under the completion voucher*.

Doc. 122-2 at 47 (emphasis added).  Relators contend a jury could determine "that the United States found compliance with all contractual provisions important, particularly because a jury could conclude from this provision that compliance with all provisions is directly connected to the United States' ability to adjust payment."  Doc. 128 at 65.  Relators then note that Federal Acquisition Regulation § 52.225-19, incorporated by reference into the contract, requires defendant and its personnel to comply with all applicable United States and host country laws.  Doc. 128 at 68.  Because defendant fraudulently obtained permits and visas in violation of Afghan law, relators assert, it failed to comply with a contractual prerequisite of payment.

The second prong of relators' argument directly addresses the materiality requirement of an implied false certification claim.  Relators argue that defendant intentionally misled USAID and withheld information about the forged documents.  Specifically, they contend the record shows that defendant:  (1) may have misled USAID into believing relators created the forged documents; (2) may have altered or destroyed paper copies of its filed visa and permit applications; and (3) improperly withheld its ethics committee report from USAID.  In light of these allegations, relators claim, a jury could conclude that USAID, if fully informed, may have refused payment of defendant's invoices—or at least reduced them.

The summary judgment facts, even when the Court views them in the light most favorable to relators, will not abide a FCA claim.  While substantial disagreement exists whether compliance with Afghan law was a prerequisite to payment, relators fail to present facts demonstrating a genuine issue whether USAID may have reduced or refused payment to defendant—*i.e.*, whether compliance with Afghan law was material to the government's payment

19

decision.  *See Lemmon*, 614 F.3d at 1169 ("[A] false certification . . . is actionable under the FCA only if it leads the government to make a payment which, absent the falsity, it may not have made."); *Conner*, 543 F.3d at 1219-20 ("If the government would have paid the claim despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA."); *see Adler*, 144 F.3d at 670 ("An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way").  The Court comes to this conclusion for two reasons, and either one, independent of the other, warrants summary judgment.

First, the uncontroverted facts cannot support relators' contention that defendant misled USAID into paying its invoices.  Relators argue that even after defendant informed the USAID OIG that its forensic analysis had searched and cleared the computers issued to relators, defendant continued to imply that relators had forged the documents by noting that their personal computers were excluded from the analysis.  Doc. 128 at 71-72.  Relators fail to cite any admissible evidence that could support this contention.  Instead, they speculate about defendant's intentions and USAID's understanding of the forensic analysis.  This speculation is insufficient to support relators' argument.  *See Bones v. Honeywell Int., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

The uncontroverted facts show that defendant, shortly after Mr. Thomas discovered the forged documents, informed the USAID OIG that it was investigating whether relators had created them.  But the uncontroverted facts also show that defendant provided a copy of its forensic report to the USAID OIG in November of 2011.  The report stated that defendant's third-party analyst had found no evidence suggesting that the forged documents originated from

relators' computers or were modified on them.  The report also determined that the computer

known as LighteningBug 1A had created several of the forged documents.  This computer,

located in defendant's Kabul human resources office, was used primarily by Khalid Afridi.  In

sum, the summary judgment record contains no evidence permitting a rational jury to conclude

that defendant misled USAID to pay based on an implication that relators had created the forged

documents.

Summary judgment also is warranted for another reason.  Even when viewed in the light

most favorable to relators, the uncontroverted facts provide no basis for a rational jury to find

that USAID may have reduced or refused payments had they seen paper copies of defendant's

employee files.  Relators note that the leader of defendant's human resources department in

Afghanistan, Mark Whitehouse, testified that he maintained paper copies in Kabul of filed permit

applications.  According to Mr. Whitehouse, he sent Kevin Miller to Kabul to obtain copies of

the applications.  Dennis Owens, defendant's Division Compliance Officer, and Tamara

McNulty, defendant's Senior Division Counsel, each testified that Mr. Miller could not locate

copies of the filed applications.  Regardless of whether paper copies were located, defendant

informed USAID that it did not maintain organized records of the documents it filed with the two

Ministries.

Relators' argument presents no genuine issue of fact whether viewing defendant's paper

files was (or may have been) material to USAID's payment decision.  Both defendant and

USAID tried, independently, to obtain copies of the filed permit applications from the Afghan

government.  After each party's requests went unfulfilled, USAID directed defendant to halt its

efforts to obtain the filed applications.  At that time, neither USAID nor defendant had

determined whether defendant had filed the forged documents.  Nevertheless, USAID continued to pay defendant's invoices.

Indeed, at defendant's request and with USAID's approval, USAID's COTR, Mr. Thomas Bauhan, executed a witness declaration on December 19, 2014.  In it, he testified that defendant informed him in July of 2011 that its personnel may have created and submitted altered diploma documents to the Afghan government.  He also testified that he was not aware, as USAID's COTR, of any alleged or actual conduct by defendant that warranted withholding payment under the contract.  Doc. 123-5 at 3.  Alvera Reichert, USAID's Contracting Officer, also executed a witness declaration with USAID's approval on December 18, 2014.  Ms. Reichert testified that defendant informed her that its personnel may have created altered educational documents and submitted them to the Afghan government.  Doc. 125-6 at 2.

Relators' implied false certification claim cannot overcome the undisputed facts established in these two USAID declarations.  Mr. Bauhan and Ms. Reichert were the two USAID representatives charged with overseeing, reviewing, and approving defendant's work and its invoices under the contract.  Both Mr. Bauhan and Ms. Reichert knew about defendant's conduct.  And the uncontroverted facts establish that no USAID representatives, including Mr. Bauhan and Ms. Reichert, saw copies of the documents actually filed with the Afghan Ministries.  Yet, USAID, at Mr. Bauhan and Ms. Reichert's direction, continued to pay defendant's invoices.  Relators speculate that USAID "might have" reduced or refused payment to defendant if it had known that defendant had violated Afghan law.  Doc. 128 at 69.  But the USAID declarations and undisputed facts, even when viewed in relators' favor, demonstrate that defendant's compliance with Afghan law was not material to the government's decision to pay defendant's invoices.  *See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612

F.3d 724, 729 (4th Cir. 2010) (finding that evidence that government officials were aware of any alleged defects and accepted a contractor's work anyway "effectively negates the fraud or falsity required by the FCA.") (citation and internal quotation marks omitted).

For the same reasons, the uncontroverted facts do not support relators' argument that USAID may have reduced or refused payments if it had known about the allegations contained in defendant's ethics committee report.  USAID conducted an independent investigation of the forged documents.  The uncontroverted facts show that both defendant and relators informed USAID of the allegation that two of defendant's employees, Mr. Whitehouse and Mr. Afridi, may have created the forged documents to obtain work permits and visas.  Both parties also provided USAID with the names of relevant witnesses, including Mr. Afridi, Mr. Whitehouse, and Dr. Manizha Hadi.  And as defendant notes, relators' First Amended Complaint alleged that the forged documents "'were created at the immediate direction of Mark Whitehouse, BVSPC's Human Resources Director working in Afghanistan.'"  Doc. 131 at 34 (quoting Doc. 18 at 7). USAID nonetheless continued to pay defendant, even though it knew about these allegations and even though it had decided that it could not determine whether defendant had filed the forged documents.  That defendant's ethics committee report may have mattered to the government's payment decision thus lacks any anchor in the summary judgment record.

USAID's conduct after relators filed suit also demonstrates that compliance with Afghan law did not matter to the government's payment decision.  Relators commenced this action and provided a copy of the Complaint and a statement of all material evidence to the government on August 23, 2011.  At that time, defendant had submitted at least nine invoices for USAID payment.  Doc. 120 at 3-4.  Since then, defendant has submitted at least forty-seven invoices to USAID.  Doc. 120 at 4-9.  USAID never demanded that defendant refund any amount paid.  Nor

has it reduced or withheld payment of an invoice submitted after relators filed suit.  Instead,

USAID has accepted and paid for all deliverable components completed by defendant under the

contract.  USAID even elected to amend the contract to award defendant more work in

Afghanistan.

USAID's conduct after relators filed this action demonstrates that defendant's

compliance with Afghan work permit and visa requirements did not matter to the government's

payment decision.  *See Conner*, 543 F.3d at 1219-20 ("If the government would have paid the

claims despite knowing that the contractor has failed to comply with certain regulations, then

there is no false claim for purposes of the FCA."); *United States ex rel. Yannacopoulos v.*

*General Dynamics*, 652 F.3d 818, 831 (7th Cir. 2011) (affirming summary judgment against an

FCA claim, the Seventh Circuit explained:  "[T]he agency failed to take action when it actually

learned of the supposed misrepresentation.  In that case, speculative testimony about how that

party may have acted if it had discovered that misrepresentation earlier cannot raise a genuine

issue of fact as to materiality."); *United States ex rel. Smith v. Boeing Co.*, No. 05-1073, 2014

WL 5025782, at *27 (D. Kan. Oct. 8, 2014) (granting summary judgment and explaining that

any lingering doubt whether a contractor's representations and non-disclosures mattered to the

government's purchase decision was "dispelled by the actions of the government purchasers after

learning of relators' claims").

Relators have failed to show a basis for a rational jury to find that defendant submitted

legally false claims for government payment.  The uncontroverted facts, even when viewed in

relators' favor, show that defendant's compliance with Afghan law was not material to the

government's decision to pay.  Defendant thus is entitled to summary judgment.

**B.  Existence of FCA Damages**

The Court next turns to the issue of damages and considers whether it provides a second, independent basis for summary judgment.

Defendant argues that summary judgment is also appropriate because relators cannot demonstrate that the government has sustained damages under the FCA.  This contention deserves the Court's consideration, as it is a reason for summary judgment that is separate and distinct from that decided above.  *See Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1256-57 (10th Cir. 2011) ("Although this court may affirm [summary judgment] on any ground apparent in the record, affirming on legal grounds not considered by the trial court is disfavored.") (citations omitted).

A violation of the FCA subjects a party to a civil penalty and "[three] times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  Under the FCA, courts measure the amount of damages sustained by the government as "the difference between what the government actually paid and the amount it would have paid in the absence of the fraudulent claim."  *United States ex rel. Woodard v. Country View Care Ctr., Inc.*, 797 F.2d 888, 893 (10th Cir. 1986) (citing *United States v. Thomas*, 709 F.2d 968, 972 (5th Cir. 1983); *United States v. Coop. Grain and Supply Co.*, 476 F.2d 47, 63 (8th Cir. 1973)). "In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false."  *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010) ("*SAIC*") (citing *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 904 (D.C. Cir. 2010); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 922-23 (4th Cir. 2003)).

Both parties cite *SAIC* as support for their position on the damages issue.  In *SAIC*, the defendant, a scientific, engineering, and technological applications company, contracted with the Nuclear Regulatory Commission ("NRC").  *Id*. at 1261-62.  The defendant agreed to provide the NRC with technical assistance and expert analysis in support of agency rulemaking.  *Id*. at 1262. The defendant's output under the contract included several written reports.  *Id*.  After defendant had completed its work, the government brought an FCA action claiming that the defendant's other engagements with for-profit companies violated a contractual prohibition against conflicts of interest.  *Id*. at 1263.  At trial, a jury returned a verdict for the government and awarded as damages the full amount paid to defendant under the contract.  *Id*. at 1264.  The D.C. Circuit overturned the jury verdict because of an instructional error, holding that the government bears the burden of proving damages.  *Id*. at 1280.  It also held that the government could recover the full amount paid only if it showed that the FCA violation prevented it from receiving anything of value.  *Id*. at 1279.

Here, defendant argues that relators cannot show that the government has sustained any damages because USAID, unlike the United States in *SAIC*, received the full value of goods and services it contracted to receive.  Defendant notes that USAID was aware of relators' allegations in 2011 and has continued to accept and pay the full amount of defendant's invoices.  Relators counter this argument, contending that the contract required defendant to provide "all services necessary" to complete defendant's work.  These services included acquiring work permits and visas for its employees.  Relators thus argue that USAID did not receive the full value of the goods and services it contracted to receive.  Relators contend that they, like the United States in *SAIC*, are entitled to a jury's determination of damages.

The alleged FCA violation in *SAIC* is different from the ones relators advance here.  The *SAIC* contract required the defendant to analyze NRC regulations and draft expert reports describing its conclusions.  There, a conflict of interest diminished the unbiased nature, and thus the value of the defendant's reports.  The D.C. Circuit held that the government was entitled to a jury's determination of the value lost because of defendant's conflict.  Here, in contrast, the uncontroverted facts show that USAID knew about the allegations against defendant and did not reduce or refuse payment of defendant's invoices.  This conduct indicates that the allegations against defendant did not diminish the value of defendant's work under the contract.

As articulated above, relators' implied false certification claim fails to demonstrate that defendant's compliance with Afghan law was material to the government's payment decision. Moreover, the uncontroverted facts, even when viewed in the light most favorable to relators, will not support relators' claim for damages under the FCA.  As defendant notes, relators and defendant informed USAID of the forged documents shortly after their discovery in June of 2011.  Still, USAID has continued to approve and accept all completed work, and has paid the full balance of defendant's invoices.  Because USAID knew about the allegations against defendant and still continued to pay all amounts due under the contract, relators cannot establish that the government may have reduced or refused payment because of the alleged falsity.  *See SAIC*, 626 F.3d at 1279 ("To establish damages, the [plaintiff] must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased.").

### VII.    Conclusion

Defendant has established that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law against relators' FCA implied false certification claim. Accordingly, for the reasons explained by this Order, the Court grants summary judgment for defendant.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 121) is granted.

**IT IS FURTHER ORDERED THAT** relators' Motion for Leave to File Surreply Memorandum (Doc. 132) is denied.

**IT IS FURTHER ORDERED THAT** relators' Motion to Reopen Discovery for Limited Purpose of Taking Deposition of William Van Dyke (Doc. 134) is denied as moot.

**IT IS SO ORDERED.**

**Dated this 5th day of June, 2015, at Topeka, Kansas.**


s/ **Daniel D. Crabtree**_____
**Daniel D. Crabtree**
**United States District Judge**